**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION**

|  |  |  |
|---|---|---|
| CENTRIPETAL NETWORKS, LLC, | § § § § | Civil Action No. 2:21-CV-00137-EWH-LRL |
| Plaintiff, | § § | |
| v. | § § | |
| PALO ALTO NETWORKS, INC., | § § § | |
| Defendant. | § § | |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR JUDGMENT ON
THE PLEADINGS PURSUANT TO F.R.C.P. RULE 12(c)**

Pursuant to Fed. R. Civ. P. 12(c), defendant Palo Alto Networks, Inc. ("PAN") moves for judgment on the pleadings that the claims of four patents asserted by plaintiff Centripetal Networks, LLC ("Centripetal")—the three "Ahn" or "Correlation" Patents (U.S. Patent Nos. 10,931,797 (the "'797 patent"), 10,659,573 (the "'573 patent"), and 10,530,903 (the "'903 patent")) as well as U.S. Patent No. 10,735,380 (the "'380 patent")—are unpatentable under 35 U.S.C. § 101 ("Section 101").[1]  The asserted claims of the Correlation Patents, which share a common specification, use conventional hardware and software to (1) determine "log entries" for data packets received and transmitted by a network device; (2) "correlate" that information by "comparing" the packets, and (3) communicate the results.  The asserted claims of the '380 patent are equally simplistic:  they use conventional hardware or software to:  (1) identify, for application packets leaving a network, a "data transfer request field" in the packet's header, (2) "determine" that field "indicates one or more network exfiltration methods," and (3) "apply" one or more

---

[1] Centripetal asserts claims 1, 12 and 17 of the '797 patent, claims 1 and 9 of the '573 patent, claim 10 of the '903 patent, and claims 16 and 25 of the '380 patent.  *See* Dkt. 357 at 1.  All four patents are attached hereto as exhibits.

unstated packet-filtering "rules" to cause the packets to be dropped "based on" such a determination.  Under the settled two-step eligibility analysis set forth in *Alice Corp. Pty. Ltd. v. CLS Bank International*, 573 U.S. 208 (2014), each asserted claim of these four patents is (1) directed to an "abstract idea"; and (2) contains no "inventive concept" sufficient to transform that abstract idea into patent-eligible subject matter.  *Id.* at 217-18.  They are therefore unpatentable.  Indeed, an ALJ of the International Trade Commission ("ITC") recently found materially indistinguishable claims of a parent patent to the Correlation Patents unpatentable under Section 101.  *See In re Certain Comput. Network Sec. Equip. & Sys., Related Software, Components Thereof, & Prods. Containing Same* ("*Certain Computer Network Security Equipment*"), USITC Inv. No. 337-TA-1314, 2023 WL 5744218, at *66-80 (Aug. 8, 2023).

The asserted claims of the Correlation Patents are directed to the abstract idea of collecting and analyzing information ("correlating" data) and presenting the results, which the Federal Circuit has routinely held is a patent-ineligible concept under Section 101.  *See*, *e.g.*, *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1356 (Fed. Cir. 2016).  The patents claim that abstract idea through generic computing devices and purely functional software components that effect no "improvement to the functionality of the computer or network platform itself."  *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1365 (Fed. Cir. 2020).  Nor do the claims supply any "inventive concept" beyond that abstract idea.  They recite no unique arrangement of the claimed generic hardware and software components or any technical detail regarding their operation.  And the claims' failure to specify any technical means or details for achieving the claimed "correlation" or its results reinforces that they are directed to the abstract idea itself.  It is for these very reasons that the ITC ALJ recently found claims of a parent patent to the Correlation Patents ineligible under Section 101.  *Certain Computer Network Security Equipment*, 2023 WL

5744218, at *66-80.  The asserted claims of the Correlation Patents here are not meaningfully distinct from the claims of that parent patent, and the claims here are likewise unpatentable for the reasons set forth in the ALJ's thorough and persuasive decision.

The asserted claims of the '380 patent fare no better.  The Federal Circuit has held that the same basic concept recited by those claims—"filtering files" on a computer network by receiving "data file[] … identifiers" and characterizing files as unwanted based on those identifiers—is an unpatentable abstract idea.  *Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1313 (Fed. Cir. 2016) ("*Symantec*").  The asserted claims of the '380 patent do no more than that.  They merely describe a simple packet-filtering method that looks at application packets exiting a computer network, and, if part of the packet's header indicates that the application might comprise an exfiltration method, drops the packets.  Underscoring the lack of any inventive concept or technological improvement, the claims do not even purport to identify ***actual*** exfiltrations; rather, they merely apply unstated rules to identify and block all application packets whose data transfer protocols "indicate" that the applications ***might*** involve exfiltrations.  There is nothing remotely innovative about that simplistic and abstract process.  As in *Symantec*, this method of filtering data files by characterizing file identifiers through generic hardware and software to identify unwanted files is an abstract idea that lacks any inventive concept that could transform it into patentable subject matter.  These claims are therefore unpatentable as well.

## I.     BACKGROUND

### A.     The Correlation Patents Simply Recite The Steps Of Collecting And Analyzing Information And Communicating The Results Using Generic Components And Functional Software.

The Correlation Patents are all entitled "Correlating Packets in Communications Networks," share the same named inventors and specification, and claim priority to U.S. Patent No. 9,264,370 ("'370 Patent), claims of which the ITC ALJ recently found invalid as patent

ineligible subject matter.  *Certain Computer Network Security Equipment*, 2023 WL 5744218, at *66-80.  The Correlation Patents recite correlating packets transmitted by a network device with packets received by that device, by comparing information about the packets in log entries.  '797 patent at 1:56-61, 8:54-9:4.[2]

The Correlation Patents purport to address a "need for correlating packets in communication networks."  *Id*. at 1:35-36.  In packet-switched networks, network devices "may alter packets associated with a flow and in doing so may potentially obfuscate the flow with which a particular packet is associated from other network devices."  *Id*. at 1:32-35.[3]  Recognizing this known issue, the patents address it by claiming a method of merely "[c]orrelating the packets transmitted by the network device with the packets received by the network device," which "may enable the computing system to determine that the packets transmitted by the network device are associated with the flow(s)."  *Id*. at 1:67-2:4.  The claimed "correlating," however, is accomplished by a generic computing system that merely (1) generates log entries for packets received and transmitted by a network device, and (2) compares information in the log entries to "correlate the packets" received and transmitted.  *Id*. at 1:48-61.

Centripetal alleges that PAN infringes six claims of the Correlation Patents.  *See supra* note 1.  Stripped of excess verbiage, asserted claim 1 of the '797 patent merely claims a "method" of (1) determining, by a computing system, "log entries" corresponding to packets received by a network device from a first network host; (2) determining log entries corresponding to packets transmitted by that network device to a second network host; (3) "correlating" the transmitted and

---

[2] When discussing the Correlation Patents, this motion cites the '797 patent specification.

[3] Such obfuscation could occur without malicious intent.  '797 Patent at 6:12.  For example, network devices may use network address translation (NAT), whereby the device receives packets with a ***private*** network address and generates corresponding packets identifying their source as a ***public*** network address for transmission over the Internet.  *Id*. at 5:30-44.

received packets "by comparing at least a first portion of the first plurality of log entries with at least a second portion of the second plurality of log entries;" and (4) "generating," based on the determined correlation, "one or more rules configured to identify packets received from the first host," which rules are then provisioned into "a packet-filtering device." *Id*. at 15:28-49. Asserted claims 12 and 17 are not materially different.[4]

Nor are the asserted claims of the '573 and '903 patents materially different from the asserted claims of the '797 patent. Claim 1 of the '573 patent discloses the same method as claim 1 of the '797 patent, with the only minor difference that the transmitted packets are "encrypted." '573 patent at 15:33. Claim 9 of the '573 patent does not meaningfully add to or limit the scope of claim 1.[5] Finally, claim 10 of the '903 patent is materially identical to the other asserted claims. It claims an apparatus with a generic processor and software that carries out the same method, with minor, immaterial additions that the network device is a "proxy" that receives and generates packets in response to "requests," each incoming packet log entry "comprises a receipt timestamp indicating a packet receipt time," each outgoing packet log entry "comprises a transmission timestamp indicating a packet transmission time," and the "correlating" generates and transmits an "indication" of the first network host.[6] '903 patent at 16:56-58, 16:67-17:1, 17:19-21.

Thus, each of the asserted claims of the Correlation Patents, with only minor variations, is

---

[4] Claims 12 and 17 of the '797 patent are "computing device" and "non-transitory computer-readable media" corollaries to the method of claim 1 and recite the same steps. Claim 1 is therefore representative of claims 12 and 17. *See Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1348 (Fed. Cir. 2014) (claims are representative for eligibility purposes if "substantially similar and linked to the same abstract idea.").

[5] Claim 9 is the "computing device" corollary to the method of claim 1 and recites the same steps. Claim 1 is thus representative of claim 9. *Content Extraction*, 776 F.3d at 1348.

[6] The parties agree that the claim contains a typographical error where the word "vindication" should be read as "indication." Dkt. 419-1.

directed to collecting and analyzing information about packets and communicating the results of

that analysis.  Figure 4 of the specification ('797 patent at 7) sets forth these rudimentary steps:



The claims recite performing these steps using generic and purely functional components.

For example, the Court has construed the "network device" that transmits and receives the packets

being correlated as simply "a device that can be connected to a network."  Dkt. 419-1.[7]  Likewise,

the "hosts" that send packets to or receive packets from the network device are generic "computing

---

[7] *See also* '797 patent at 3:2-7 (network device "may include one or more devices (e.g., servers, routers, gateways, switches, access points, or the like) that interface hosts"); *id*. at 5:45-49 (network device "may comprise a proxy (e.g., a web proxy, a domain name system (DNS) proxy, a session initiation protocol (SIP) proxy, or the like) configured to receive requests and generate corresponding requests.").)

or network devices (e.g., servers, desktop computers, laptop computers, tablet computers, mobile devices, smartphones, routers, gateways, switches, access points, or the like)." '797 patent at 2:60-66. The computing system that identifies packets, generates log entries, and correlates packets is generically described by its functions. *Id*. at 1:48-2:4. "Networks" can broadly include "Local Area Networks (LANs), Wide Area Networks (WANs), Virtual Private Networks (VPNs)," "the Internet, a similar network, or portions thereof." *Id.* at 2:49-58.

The remaining claim elements similarly consist of abstract concepts and generic and result-focused functional language. For example, the Court has construed "log entries" to mean, simply, "notations of identifying information for packets," Dkt. 419-1, with the specification providing a nearly boundless list of examples of such information. '797 patent at 4:30-64. The Court construed "packets" to have its plain and ordinary meaning, Dkt. 452 at 25, and the parties agreed that it means "data units for transmission over a network." Dkt. 452 at 23. The Court construed "rules" broadly as a "condition or set of conditions that when satisfied cause a specific function to occur." Dkt. 452 at 32. And the patents describe the "correlation" as the comparison of information in log entries, with no technical detail for how this is carried out. The specification's references to the claimed correlation describes results and functions flowing from the collection and analysis of data, but no particular way to achieve them.[8]

Far from providing technical detail for these elements, the specification broadly provides that "the functions and steps described herein may be embodied in computer-usable data or computer-executable instructions" such as "program modules," '797 patent at 14:45-67, that "the

---

[8] '797 patent at 8:54-9:4, 12:1-11 (correlation involves "compar[ing] data" in log entries and determining that data in one log entry "corresponds" with data in another log entry); *id.* at 9:32-51 (correlation includes comparing timestamps in log entries and performing subtraction to determine "the smallest difference in time indicated by the timestamps"); *id.* at 12:11-22 (correlation includes comparing data from one or more requests in packets transmitted and received by a network device comprising a proxy.)

various methods and acts may be operative across one or more computing devices and networks," *id*. at 15:10-12, and that "[t]he functionality may be distributed in any manner or may be located in a single computing device (e.g., a server, client computer, or the like)," *id*. at 15:12-14. Reinforcing the claims' generic and purely functional nature, the patents state that "[a]ny and all features in the following claims may be combined or rearranged in any way possible." *Id*. at 15:23-25.  No meaningful technical detail is disclosed.

### B. The Asserted Claims Of The '380 Patent Simply Recite Filtering Unwanted Data Files Based On Looking At File Identifiers.

Claims 16 and 25 of the '380 patent are substantively identical to each other.  They both claim the same packet-filtering method in the same language; claim 16 describes the method implemented on generic computer hardware whereas claim 25 describes it implemented through generic software.  Both claims are simplistic.  They require the hardware or software to:  (1) "determine," based on unstated "packet-filtering rules," that data packets including an application packet are exiting a protected network; (2) "identify," in that packet's header, a "data transfer request field;" and (3) "apply" one or more undescribed "operators" specified by the unstated rules to cause the packets to be dropped "based on" a "determination" that the data transfer request field "indicates one or more network exfiltration methods."  '380 patent at 13:36-14:2, 15:21-16:6.  In plain English, this claim involves nothing more than dropping an outgoing application packet based on a determination that one part of the packet's header indicates that the application involves a possible exfiltration method because it meets an unstated packet filtering rule.

The specification reinforces the claims' rudimentary nature.  The specification notes that it was already common knowledge that "many exfiltrations are facilitated by using popular network data transfer protocols, such as the Hypertext Transfer Protocol (HTTP) used by the World Wide Web."  *Id*. at 1:34-37.  And it describes the asserted claims as directed to a filter that

"compare[s] certain packet header information … with one or more packet filtering rules" and drops the packet if the header information indicates a possible exfiltration method. *Id*. at 2:18-31. And while the claims do not specify actual filtering rules, the specification notes that rules might prohibit a user from "communicating with a web server" in any manner because it was already known that "attackers may often use [such] methods to exfiltrate sensitive data…." *Id*. at 7:16-26.

And as with the Correlation Patents, the asserted claims of the '380 patent are carried out using wholly generic hardware and software. The claimed "packet security gateway (PSG) may include one or more computing devices configured to receive packets, and apply one or more filters or operators." '380 patent at 3:64-66. The specification describes the claimed "networks" just as broadly as in the Correlation Patents. *Id*. at 3:35-47. The patent's functions and steps "may be embodied in computer-usable data or computer-executable instructions, such as in one or more program modules, executed by one or more computers or other devices to perform one or more functions described herein." *Id.* at 10:52-56. And "functionality may be distributed in any manner, or may be located in a single computing device (e.g., a server, a client computer, etc.)." *Id*. at 11:19-22. Moreover, while the specification sets forth various "exemplary" filtering rules, no such rules are set forth in any of the claims themselves.

## II.   LEGAL STANDARDS

### A.   Rule 12(c)

Patentability under 35 U.S.C. § 101 is a "threshold" legal issue, *Bilski v. Kappos*, 561 U.S. 593, 602 (2010), and thus "may be, and frequently has been, resolved on a Rule 12(b)(6) or (c) motion." *SAP Am. Inc. v. Investpic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018); *see also, e.g.*, *Geoscope Techs. PTE. Ltd. v. Google LLC*, 2023 WL 6120603, at *5 (E.D. Va. Sept. 18, 2023), *appeal filed* (Fed Cir. Oct. 2, 2023) (granting Rule 12(c) motion and invalidating as ineligible claims directed to "providing a database, collecting data, modifying the collected data, and

comparing the modified data against the database to determine a location of a mobile device"). Resolving eligibility on the pleadings minimizes "expenditure of time and money by the parties and the court," guards against "vexatious infringement suits," and "protects the public" from unworthy patents that improperly monopolize the public store of knowledge. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 719 (Fed. Cir. 2014) (Mayer, J., concurring) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007)).

"A Rule 12(c) motion is reviewed under the same standard as a Rule 12(b)(6) motion." *Geoscope Techs.*, 2023 WL 6120603, at *2 (citing *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 474 (4th Cir. 2014)).  Judgment on the pleadings should be granted where "'there are no factual allegations that, taken as true, prevent resolving the [patent] eligibility question as a matter of law.'" *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 765 (Fed. Cir. 2019) (citation omitted).  Although the Section 101 inquiry may occasionally involve "underlying issues of fact," "conclusory statements regarding eligibility" "are not factual allegations" and are disregarded. *Cisco Sys., Inc. v. Uniloc 2017 LLC*, 813 F. App'x 495, 498-99 (Fed. Cir. 2020).[9]  Thus, "[a] statement that a feature 'improves the functioning and operations of the computer' is, by itself, conclusory" and irrelevant to the eligibility determination.  *Simio, LLC v. Flexsim Software Prods., Inc.*, 983 F.3d 1353, 1365 (Fed. Cir. 2020).  Likewise, a plaintiff may not manufacture a factual dispute simply by pleading that "the claim limitations involve more than performance of well-understood, routine, and conventional activities previously known to the industry." *Content Extraction*, 776 F.3d at 1347-48 (internal alterations omitted).  Finally, a court "need not accept as

---

[9] *Accord Boom! Payments, Inc. v. Stripe, Inc.*, 839 F. App'x 528, 533 (Fed. Cir. 2021) (courts "disregard conclusory statements when evaluating a complaint under Rule 12(b)(6)"); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014) ("We do not, however, 'accept as true a legal conclusion couched as a factual allegation.'") (citation omitted).

true allegations that contradict matters properly subject to judicial notice or by exhibit, such as the claims and the patent specification." *Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 913 (Fed. Cir. 2017) (cleaned up).

### B.    Patent-Eligible Subject Matter.

Section 101 provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. However, "[l]aws of nature, natural phenomena, and abstract ideas are not patentable." *Alice*, 573 U.S. at 216 (cleaned up).  These categories are not patent-eligible because "they are the basic tools of scientific and technological work" that are "free to all men and reserved exclusively to none." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 70-71 (2012) (cleaned up). Under *Alice*, a claim falls outside Section 101 if (1) it is directed to an abstract idea, and (2) lacks an inventive concept sufficient to transform the claim into patent eligible subject matter.  *Hawk Tech. Sys., LLC v. Castle Retail, LLC*, 60 F.4th 1349, 1356 (Fed. Cir 2023) (citation omitted).

## III.   ARGUMENT

### A.    The Asserted Claims Of The Correlation Patents Are Ineligible Under § 101.

### 1.    The Claims Are Directed To The Abstract Concept Of Collecting And Analyzing Information And Communicating The Results.

*Alice* step one requires determining whether an asserted claim's "focus" or "character as a whole" is directed to patent-ineligible subject matter, such as an abstract idea.  *Elec. Power Grp.*, 830 F.3d at 1353.  The inquiry focuses "on the language of the asserted claims, considered in light of the specification," and assesses what the patent asserts to be the "focus of the claimed advance over the prior art." *Hawk Tech. Sys.*, 60 F.4th at 1356 (cleaned up).  Courts considering step one

have found claims abstract where they are directed to "a wide variety of well-known and other activities," including in the computer field. *Symantec*, 838 F.3d at 1314 & n.5 (collecting cases).

The Federal Circuit has long held that "claims focused on 'collecting information, analyzing it, and displaying certain results of the collection and analysis' are directed to an abstract idea." *SAP*, 898 F.3d at 1167 (quoting *Elec. Power Grp.*, 830 F.3d at 1353). That is because "[i]nformation as such is an intangible, hence abstract, and collecting information, including when limited to particular content (which does not change its character as information), is within the realm of abstract ideas." *Id.* (cleaned up). In a similar vein, the Federal Circuit has "treated analyzing information by steps people go through in their minds, or by mathematical algorithms, without more, as essentially mental processes within the abstract-idea category." *Elec. Power Grp.*, 830 F.3d at 1354. And "merely presenting the results of abstract processes of collecting and analyzing information, without more (such as identifying a particular tool for presentation), is abstract as an ancillary part of such collection and analysis." *Id.*

The asserted claims of the Correlation Patents are directed to this ineligible abstract idea of collecting information, analyzing it, and communicating the results. They are focused on collecting information about packets received and transmitted by a network device, comparing that information to "correlate" the packets, and, based on the correlation, transmitting an indication of a host ('903 patent) or identifying packets received from the host ('573 patent and '797 patent). Case after case confirms that these are abstract concepts, specifically including where the analyzing involves organizing information through "correlations." *Elec. Power Grp.*, 830 F.3d at 1353-54 (collecting cases); *Geoscope Techs.*, 2023 WL 3120603, at *6 ("[T]he Federal Circuit has consistently concluded that claims requiring the mere collection, analysis, and outputting of data are directed to patent-ineligible subject matter."); *Smart Sys. Innovations, LLC v. Chicago Transit*

*Auth.*, 873 F.3d 1364, 1372 (Fed. Cir. 2017) ("[C]laims directed to the collection, storage, and recognition of data are directed to an abstract idea"); *CardioNet, LLC v. InfoBionic, Inc.,* 816 F. App'x 471, 475 (Fed. Cir. 2020) (claims that correlated one set of data about arrhythmia events to another to determine whether the events are valid were directed to abstract concept of "collecting, analyzing, and displaying data")*; Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1350 (Fed. Cir. 2014) (finding claims describing a "process of organizing information through mathematical correlations" to be abstract).

*Electric Power Group* involved an abstract concept similar to the one claimed in the Correlation Patents.  There, the claims were directed to a method of detecting events on a power grid including receiving data streams with time-stamped measurements, detecting and analyzing events from the data streams and deriving metrics, displaying the event analysis results and metrics, displaying concurrent visualization of the measurements and metrics, and deriving an indicator of power grid vulnerability from the measurements and metrics.  *Elec. Power Grp.*, 830 F.3d at 1351-52.  Cataloguing the numerous Supreme Court and Federal Circuit precedents finding such information processing inventions to be abstract, the court held that the claims were directed to the abstract idea of "collecting information, analyzing it, and displaying certain results of the collection and analysis."  *Id*. at 1353.  The court observed that "[t]he advance [the claims] purport to make is a process of gathering and analyzing information of a specified content, then displaying the results, and not any particular assertedly inventive technology for performing those functions."  *Id*. at 1354.  The court also distinguished the claims from those reciting patent-eligible computer improvements, observing that "the focus of the claims is not on such an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools."  *Id*.  Those words could have been written for this case.

Beyond that, the aspirational and purely functional nature of the claims asserted in this case reveals yet another telltale sign that the claims are abstract. *In re TLI Commc'ns*, 823 F.3d 607, 612 (Fed. Cir. 2016); *Elec. Power Grp.*, 830 F.3d at 1354 (claims that do not recite "any particular assertedly inventive technology" for performing the collection, analysis and communication of information are abstract). The claims provide no technical or programming detail for how the claimed "correlation" is achieved or how it results either in an indication of the host that sent packets to the network device ('903 patent) or rules for identifying packets from that host ('797 and '573 patents). For example, the claims do not explain or limit how the generic "computing system," "computing device," or "instructions" of the claims would be programmed to achieve these results. The specification does not provide this disclosure, either.

Thus, the claims recite the type of functional language that routinely is held to reflect an abstract idea. *See Two-Way Media Ltd. v. Comcast Cable Communc'ns, LLC*, 874 F.3d 1329, 1333, 1337-38 (Fed. Cir. 2017) (finding claims involving "improved scalable architecture for delivering real-time information" abstract because they routed information using "result-based functional language"); *Hawk Tech. Sys.*, 60 F.4th at 1358 (claims for remote viewing of video images abstract because claims lacked "sufficient recitation of ***how*** the purported invention improve[s] the functionality of video surveillance systems") (citation omitted); *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1328 (Fed. Cir. 2020) ("Merely claiming those functions in general terms, without limiting them to technical means for performing the functions that are arguably an advance, does not make a claim eligible") (citation omitted); *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1241 (Fed. Cir. 2016) (finding claims abstract where they "do not claim a particular way of programming or designing the software … but instead merely claim the resulting systems").

14

The decision in *Certain Computer Network Security Equipment* finding the claims of the parent patent to be abstract reinforces that the claims here are as well.[10]  There, relying on *Electric Power Group* and other Federal Circuit cases finding information processing claims to be abstract, the ALJ held that claims 22 and 43 of the '370 Patent—a parent of the Correlation Patents—are directed to the abstract idea of "collecting information, analyzing information, and communicating the results."  *Id*. at 75.  Those claims are not meaningfully distinct from the asserted claims of the Correlation Patents.  They recite (1) collecting information to identify packets transmitted and received by a network device that match a "rule," (2) recording information about identified packets (*i.e.*, generating a log entry), (3) communicating the log entry, (4) analyzing the log entries to "correlate" the packets sent and received by a network device, and (5) communicating the results of the correlation.  *Id*. at 68 (summarizing elements of claims 22 and 43).  The ALJ reasoned that these elements show the claims are "focused on a combination of abstract-idea processes of 'collecting information,' 'analyzing information,' and 'presenting the results of abstract processes of collecting and analyzing information,' which have been held to be directed to an abstract idea."  *Id*.  The ALJ further reasoned that the claims "do not recite a 'particular assertedly inventive technology' and merely manipulate data in an abstract way, which further supports that they are directed to an abstract idea."  *Id*. at 71.

Thus, the asserted claims of the Correlation Patents are directed to an abstract concept: collecting information, analyzing information, and communicating the results.  To the extent the claims describe a purported advance, it is on collecting and analyzing information, and not on any

---

[10] The ITC decision is both illustrative and an agency decision that the Court may judicially notice. *See Witthohn v. Fed. Ins. Co.*, 164 F. App'x 395, 396 (4th Cir. 2006); *Opoka v. INS*, 94 F.3d 392, 394 (7th Cir. 1996); *see also Apple, Inc. v. Motorola Mobility, Inc.*, 2012 WL 5416941, at *8-9 (W.D. Wis. Oct. 29, 2012) (taking judicial notice of ITC records).

inventive technology.  That is the essence of an abstract idea, *Elec. Power Grp.*, 830 F.3d at 1354, and the asserted claims fail under *Alice* step one.

### 2.     The Claims Do Not Recite A Technological Improvement.

The asserted claims of the Correlation Patents also do not disclose specific features directed to a technological improvement as required to pass muster under step one.  "The Federal Circuit's case law makes clear that claims directed to forms of data collection and manipulation must offer technical improvements to computer technology in order to not be directed to an abstract idea." *Mgmt. Sci. Assocs. v. Datavant, Inc.*, 510 F. Supp. 3d 238, 249 (D. Del. 2020).  But such technical improvements do not materialize simply because a claim is "carried out in a computational environment."  *Realtime Data LLC v. Array Networks Inc.*, 556 F. Supp. 3d 424, 434-35 (D. Del. 2021).  Even where attempting to solve computer or network problems, claims may be "directed to the type of abstract data manipulation that is not patent eligible."  *Id.*; *see also, e.g.*, *Two-Way Media*, 874 F.3d at 1334-35, 1338-39 (claims for routing/monitoring "digital packets" abstract, despite purporting to recite network architecture for solving congestion problems); *Hawk Tech. Sys.,* 60 F.4th at 1357-58 (claims for remote viewing of video images abstract despite purporting to conserve bandwidth); *Glasswall Sols., Ltd. v. Clearswift Ltd.*, 754 F. App'x 996, 997-98 (Fed. Cir. 2018) (claims for virus-protection software using values in rules abstract).

In determining whether purported "software innovations" recite an abstract idea or, instead, a patent-eligible technological improvement, courts assess whether the claims focus "on the specific asserted improvement in computer capabilities … or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool."  *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335-36 (Fed. Cir. 2016).  The asserted claims of the Correlation Patents are in the latter category.  Nothing in the asserted claims provides any technical improvements to computers or networks.  Instead, information about packets is collected and compared in order to

"correlate" the packets, and the results of that analysis are communicated.  All of this is accomplished using generic devices and purely functional software with no specificity or technical detail in the claims, or even the specification.  For example, the specification states the claimed "correlating" is somehow achieved simply by comparing information about one packet with information about another packet.  '797 patent at 8:54-9:4, 9:32-51, 12:1-22.  But neither the claims nor the specification discloses any specific techniques or details that would explain how the claimed "correlating" is achieved, or how it results in generating rules for identifying packets received from the host that sent packets to the network device ('797 and '573 patents) or an indication of that host ('903 patent)—much less any improvement in computer technology.

Thus, as was held in the ITC decision, the asserted claims are wholly unlike those instances where courts have upheld claims at step one for reciting a patent-eligible computer improvement.  *Certain Computer Network Security Equipment*, 2023 WL 5744218, at *74-75 (distinguishing cases relied on by Centripetal to argue that claims 22 and 43 of the '370 patent recite a patent-eligible improvement).  Unlike the patent claims at issue in those cases, the asserted claims here do not recite any specific improvement to computers, networks, or any other technology, and simply use the existing capabilities of computers to collect and compare data in a purely functional manner and then communicate the results.[11]  As the ALJ held in the ITC case with regard to the

---

[11] *Cf. SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1303-04 (Fed. Cir. 2019) (finding that claims were directed to a "***specific technique***" for solving a "technological problem arising in computer networks," where "the claims actually ***prevent the normal, expected operation of a conventional computer network***") (emphasis added); *Packet Intel. LLC v. NetScout Sys.*, 965 F.3d 1299, 1309-10 (Fed. Cir. 2020) (claims recited a "***specific improvement*** in computer technology" where specification provided ***technological implementation*** of the lookup engine and flow insertion engine as used in the claims) (emphasis added); *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1305-06 (Fed. Cir. 2018) (claims "employ[ed] ***a new kind of file that enables a computer security system to do things it could not do before***") (emphasis added); *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1295-96 (Fed. Cir. 2020) (claims recited ***multiple levels of encryption combined with labeling*** to allow for simultaneous transmission of secure information to a large group of recipients connected to a decentralized network); *Ancora Techs., Inc. v. HTC Am., Inc.*,

materially indistinguishable parent patent, the claimed "correlating" step "simply compares information about one packet with information about another packet to determine whether the packets are from the same packet flow" and "the claims do not require 'concrete implementation' for performing the correlation, nor does the specification disclose any 'concrete implementation' … that would explain how the claimed 'correlation' is achieved." *Certain Computer Network Security Equipment*, 2023 WL 5744218, at *73.

Tacitly acknowledging that asserted claims of the Correlation Patents are vulnerable to a Section 101 challenge, Centripetal sprinkled its Amended Complaint with conclusions about the purported technological improvements made by those patents. Dkt. 65, ¶¶ 41-44. But as noted above, *see supra* at 10, such conclusory allegations—which relate to the patents as a whole—cannot save the asserted claims. For example, Centripetal alleges that its "dynamic network security solutions allow network users to implement effective security systems that protect against the latest evolution of network threats." Dkt. 65, ¶ 41. But neither the asserted claims of the Correlation Patents nor the specification even mentions "dynamic" network security solutions or "network threats"—and the claims certainly recite nothing inventive for addressing them. The same holds true for Centripetal's allegation that the asserted patents "are directed to improvements in the way computers analyze network packets and filter these packets to circumvent network threats." *Id*. ¶ 42. Neither the asserted claims of the Correlation Patents nor the specification recites such improvements; instead, the claims recite collecting and analyzing information about packets using generic computing components without disclosing any particular technique for doing

---

908 F.3d 1343, 1348-49 (Fed. Cir. 2018) (claimed method "***specifically identifi[ed] ... a structure … stored in a particular, modifiable, non-volatile portion of the computer's BIOS***" to address "a technological problem with computers") (emphasis added).

so, let alone an improved one.  *See Simio*, 983 F.3d at 1365 ("A statement that a feature 'improves the functioning and operations of the computer' is, by itself, conclusory" and thus irrelevant).

Next up, Centripetal's conclusory assertion that data packets "are concrete and tangible things" because they "include pieces of computer files" is inaccurate and irrelevant.  Dkt. 65 at ¶ 43.  In claim construction, Centripetal advocated that packets are "data units for transmission," not "tangible things."  Dkt. 452, at 23.  In any event, tangibility is irrelevant to eligibility.  *Alice*, 573 U.S. at 224 (fact that a computer "necessarily exists in the physical, rather than purely conceptual, realm, is beside the point.") (cleaned up).  Similarly, Centripetal's allegation that the asserted patents "are rooted in computer technology and include elements such as computer processors and memory, which are required to process computer network packets," Dkt. 65, ¶ 43, does not render these claims eligible.  "[T]he fact that [a] claim is limited to a particular networking environment does not render the claims any less abstract," even if the claims recite "packets." *Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*, 778 F. App'x 882, 889, 892-93 (Fed. Cir. 2019) (claims reciting generating and embedding an alphanumeric string "in an extensible field of a packet" are abstract); *Two-Way Media*, 874 F.3d at 1334-35, 1338-39 (claims for routing/monitoring "digital packets" abstract).  And "it is hard to imagine a patent claim that recites hardware limitations in more generic terms" than "a 'computer' with a 'processor' and a 'memory.'" *In re Bd. of Trs. of Leland Stanford Junior Univ.*, 989 F.3d 1367, 1374 (Fed. Cir. 2021).

Centripetal's conclusory allegations thus find no support in the asserted claims and are therefore irrelevant.  *See Cisco Sys.,* 813 F. App'x at 498-99 ("conclusory statements regarding eligibility" "are not factual allegations" and do not preclude dismissal); *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016) ("The § 101 inquiry must focus on the language of the Asserted Claims themselves.").

### 3.    The Claims Lack An Inventive Concept Beyond The Abstract Idea.

In applying *Alice* step two, having identified the abstract idea to which a claim is directed, courts look at the elements of the claim "both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application."  *Alice*, 573 U.S. at 217 (cleaned up).  "[S]imply appending conventional steps, specified at a high level of generality, to … abstract ideas cannot make those … ideas patentable." *Mayo*, 566 U.S. at 82.  "If a claim's only 'inventive concept' is the application of an abstract idea using conventional and well-understood techniques, the claim has not been transformed into a patent-eligible application of an abstract idea." *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290-91 (Fed. Cir. 2018).

Accordingly, "merely reciting an abstract idea performed on a set of generic computer components," does not infuse the claim with an inventive concept.  *Two-Way Media*, 874 F.3d at 1339.  So too here.  The asserted claims contain no inventive concept beyond the abstract concept of collecting and analyzing information and communicating the results.  As detailed above, the Court's constructions and the patents themselves confirm that the individual claim elements are conventional devices and functionally-described, including the "computing system/device," "processor," "memory," "instructions," "network device," "host," "packet-filtering device," "network," "log entries" and "rules."  *See supra* at 6; *see also Certain Computer Network Security Equipment*, 2023 WL 5744218, at *71 ("[T]he recitation of 'packets' and other conventional computer technology in the asserted claims does not save the asserted claims from reciting an abstract idea of collecting information, analyzing it, and communicating the results.").  Thus, the claims "amount to nothing significantly more than an instruction to apply the abstract idea … using some unspecified, generic computer," which is insufficient to render the claims eligible. *Alice*, 573 U.S. at 226 (citation omitted).  Moreover, the claimed rules "configured to identify packets

received from the first host" ('797 patent, claims 1, 12, 17; '573 patent claims 1, 9) cannot provide an inventive concept because they "merely describe the functions of the abstract idea itself." *Intell. Ventures I LLC v. Capital One Fin. Corp.,* 850 F.3d 1332, 1341 (Fed. Cir. 2017) ("*Capital One*"); *see FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1095 (Fed. Cir. 2016) (generating and applying rules for detecting fraud and misuse, storing the result, and announcing the result failed to provide inventive concept).

Similarly, the claimed correlation of packets received and transmitted by a network device provides nothing inventive either, because it is accomplished by the abstract process of comparing information logged about the packets, with no other specificity. *See Clarilogic, Inc. v. FormFree Holdings Corp.*, 681 F. App'x 950, 954-55 (Fed. Cir. 2017) (holding claim ineligible that recited an "unknown and unclaimed process" to allegedly transform data). Indeed, the claims do not disclose any detail for how the correlation is achieved or used. "Such vague, functional descriptions … are insufficient to transform the abstract idea into a patent-eligible invention." *TLI Commc'ns*, 823 F.3d at 615; *see also MacroPoint, LLC v. FourKites, Inc.*, 2015 WL 6870118, at *5 (N.D. Ohio Nov. 6, 2015), *aff'd*, 671 F. App'x 780 (Fed. Cir. 2016) (claimed correlation of information was non-inventive because "[c]orrelating simply connotes the ascertaining of a relationship between two pieces of information."); *Digitech*, 758 F.3d at 1350-51 (finding patent to "a process of organizing information through mathematical correlations" ineligible).

As in *Electric Power Group*, "[n]othing in the claims, understood in light of the specification, requires anything other than off-the-shelf, conventional computer, network, and display technology for gathering, sending, and presenting the desired information." 830 F.3d at 1355; *see also Two-Way Media*, 874 F.3d at 1340-41 (claims requiring "processing data streams, transmitting them from 'an intermediate computer,' and then confirming certain information about

the transmitted data" or that otherwise required "conventional computer and network components operating according to their ordinary functions" lacked an inventive concept).  Thus, the claims "merely describe the functions of the abstract idea itself, without particularity." *Capital One*, 850 F.3d at 1341.  "This is simply not enough under step two."  *Id*. (internal citation omitted). Moreover, there is nothing inventive about the arrangement of the claim elements.  The specification acknowledges this, stating that "the various methods and acts may be operative across one or more computing devices and networks," '797 patent at 15:10-12, that "[t]he functionality may be distributed in any manner or may be located in a single computing device (e.g., a server, client computer, or the like)," *id*. at 15:12-14, and that "[a]ny and all features in the following claims may be combined or rearranged in any way possible," *id*. at 15:23-25.  S*ee Affinity Labs of Tex., LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1271 (Fed. Cir. 2016) (statement that invention was "not limited to any specific configuration" confirmed lack of inventive concept).  The ITC ALJ's decision's determination that materially identical claims 22 and 43 of the '370 patent, which recite similarly generic computer components and purely functional software concepts for accomplishing correlation of packets received and transmitted by a network device to identify the host that sent the packets, reinforces that the asserted claims of the Correlation Patents lack an inventive concept. *Certain Computer Network Security Equipment*, 2023 WL 5744218, at *76-80.

Finally, as with step one, the claims in this case are wholly unlike those instances where courts have found an inventive concept in patents directed to improvements in computer technology.  *Cf. DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1258 (Fed. Cir. 2014) (claims that "overr[ode] the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink" held eligible); *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility*

*LLC*, 827 F.3d 1341, 1351 (Fed. Cir. 2016) (installation of filtering tool at specific location, remote from end users, with customizable filtering features specific to each end user represented a "technology-based solution" to "overcome[] existing problems with other Internet filtering systems.").

In short, whether viewed individually or as an ordered combination, the elements of the asserted claims of the Correlation Patents provide no inventive concept.  The claims thus fail *Alice*'s second prong as well and are therefore unpatentable.

**B.    The Asserted Claims Of The '380 Patent Are Ineligible Under Section 101.**

**1.    The Asserted Claims Are Directed To The Abstract Concept Of Filtering Unwanted Data Files Based On File Identifiers.**

The asserted claims of the '380 patent are ineligible under Section 101 for many of the same reasons that the asserted claims of the Correlation Patents are ineligible:  they are directed to an abstract concept involving filtering files and claim no improvement in computer technology and no inventive concept beyond the use of generic computer hardware and software to perform the abstract idea.  In *Symantec*, the Federal Circuit held that "receiving e-mail (and other data file) identifiers, characterizing e-mail based on the identifiers, and communicating the characterization—in other words, filtering files/e-mail—is an abstract idea."  *Symantec*, 838 F.3d at 1313.  Similarly, the court has held that "a claim to a 'content filtering system for filtering content retrieved from an Internet computer network[, e.g., to prevent users from accessing certain websites] ... is [directed to] an abstract idea."  *Id*. at 1314 (quoting *BASCOM*, 827 F.3d at 1348; alterations original).  These basic concepts are merely akin to the "long-prevalent practice for people receiving paper mail to look at an envelope and discard certain letters, without opening them, from sources from which they did not wish to receive mail based on characteristics of the mail."  *Id*.  Characterizing computer files, such as e-mail, "based on a known list of identifiers is

no less abstract." *Id.*; *see also PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1316 (Fed. Cir. 2021) (claims unpatentable where they were "directed to the use of an algorithm-generated content-based identifier to perform … data-management functions," including "marking copies of data items for deletion"); *Intell. Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1327 (Fed. Cir. 2017) (claims that "merely collect, classify, or otherwise filter data" are unpatentable); *FairWarning*, 839 F.3d at 1093 (claims unpatentable where they merely "collect[ed] information regarding accesses of a patient's personal health information, analyze[d] the information according to one of several rules … to determine if the activity indicate[d] improper access, and provide[d] notification if … improper access ha[d] occurred"); *Glasswall*, 754 F. App'x 996, 998 (Fed. Cir. 2018) (claims that "deliver the allowable content and inhibit the communication of other content … merely require the conventional manipulation of information by a computer" and "[w]e have often held similar conventional data manipulation to be abstract").

Much like the patent claims addressed in these cases, the asserted claims of the '380 patent are directed to the abstract concept of filtering unwanted data files based on file identifiers. The only conceivable difference is that the claims here are purportedly screening for potential exfiltrations (*i.e.*, attempts to steal information) rather than potential infiltrations (*i.e.*, viruses or other malware). But that does not make them any less abstract or more inventive. A pre-Internet business might have embargoed outgoing communications if their addresses indicated they were destined for potentially suspicious sources (such as, for example, a competitor). *See*, *e.g.*, *Symantec*, 838 F.3d at 1317 (applying "analogy to [] corporate mailroom[s]," which "keep business rules defining actions to be taken regarding correspondence based on attributes of the correspondence, apply those business rules to correspondence, and take certain actions based on the application of business rules," including "releasing, deleting, returning, or forwarding the

message").  The asserted claims of the '380 patents involve merely the same basic activity implemented on a computer network:  block an outgoing application packet if its data header field indicates a type of data-transfer protocol that could be used for exfiltration.  *See also Ericsson*, 955 F.3d at 1327 ("[W]e have repeatedly found the concept of controlling access to resources via software to be an abstract idea").

### 2.    The Claims Do Not Recite A Technological Improvement.

As in *Symantec*, and as discussed above with regard to the Correlating Patents, the steps of the asserted claims of the '380 patent "do not 'improve the functioning of the computer itself,' for example by disclosing an 'improved, particularized method of digital data compression,' or by improving 'the way a computer stores and retrieves data in memory.'"  *Symantec*, 838 F.3d at 1315 (quoting *Alice*, 573 U.S. at 225; *Enfish*, 822 F.3d at 1339; *DDR Holdings*, 773 F.3d at 1259). "Rather, these claims use generic computers to perform generic computer functions."  *Id.*  Just as in *Symantec*, the '380 patent merely applies a conventional packet-filtering function using generic hardware and software to identify unwanted data files.  There is not even any manipulation of data other than the simple direction—also present in *Symantec*—of dropping files meeting unspecified matching criteria, and the specification makes clear that types of potential exfiltration file transfer methods were already known in the art.  *See, e.g.*, *id.* at 1319 ("The specification recites conventional 'virus screening software,'" and "[b]y itself, virus screening is well-known and constitutes an abstract idea."); '380 patent at 1:34-37 (noting that it was previously known that "many exfiltrations are facilitated by using popular network data transfer protocols, such as the Hypertext Transfer Protocol (HTTP)").

In sum, given that "receiving … data file … identifiers, characterizing e-mail based on the identifiers, and communicating the characterization—in other words, filtering files/e-mail—is an abstract idea," *Symantec*, 838 F.3d at 1313, so too is the file-filtering method of the '380 patent.

### 3.    The Claims Lack An Inventive Concept Beyond The Abstract Idea.

Just as in *Symantec* and similar cases, and as discussed with regard to the Correlation Patents, the asserted claims of the '380 patent contain no inventive concept beyond the unpatentable abstract idea.  The claims recite a mere filtering function and do not even set forth any particular rules or criteria by which potential exfiltrations can be identified.  And the specification makes clear that the claimed systems and methods do not even purport to identify or block actual exfiltrations but instead block entire categories of data transfers merely because they **might** be used for exfiltrations.  These claims are directed to the unpatentable abstract idea of filtering unwanted data files based on file identifiers, and add nothing inventive to that idea.

Nor are the claims saved by the specification's use of a particular file transfer protocol to identify potential exfiltration, as the specification indicates that this concept was already known.  *See* '380 patent at 1:34-37 ("[m]any exfiltrations are facilitated by using popular network data transfer protocols, such as the Hypertext Transfer Protocol (HTTP) used by the World Wide Web").[12]  In any event, the Section 101 inventiveness inquiry is limited to the claims themselves, which contain no specific filtering rules.  *See* '380 patent at 9:1-4 ("[N]ew network applications may emerge in the future which may use new data transfer protocols or application-layer protocols to which the present methods may be applied.").[13]  And even if Centripetal had discovered a new

---

[12] *Cf. Centripetal Networks, Inc. v. Cisco Sys., Inc.*, 847 F. App'x 869, 880 (Fed. Cir. 2021) (invalidating similar Centripetal patents based on 2011 prior art that employed concept of identifying and blocking packets by examining data transfer format in packet headers); and *Centripetal Networks, Inc. v. Cisco Sys., Inc.*, 847 F. App'x 881, 887-88 (Fed. Cir. 2021) (same).

[13] *ChargePoint*, 920 F.3d at 769 ("any reliance on the specification in the § 101 analysis must always yield to the claim language" because "the specification cannot be used to import details from the specification if those details are not claimed"); *Two-Way Media*, 874 F.3d at 1338-39 (the "inventive concept must be evident in the claims" and holding omission of elements in claims "precluded their contribution to the inventive concept determination."); *Symantec*, 838 F.3d at 1322 (patentee may not use the "patent's specification … to find an inventive concept"); *Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013) ("[T]he

filtering rule, that would not impart eligibility to its claims: "[b]ecause these filtering rules are part of the abstract idea itself, they cannot provide an inventive concept." *People.ai, Inc. v. Clari Inc.*, 2023 WL 2820794, at *12 (Fed. Cir. Apr. 7, 2023). A rule is a quintessentially abstract concept. *See*, *e.g.*, *FairWarning*, 839 F.3d at 1094 (claims "directed to collecting and analyzing information to detect misuse and notifying a user when misuse is detected" are abstract ideas and "using one of a few possible rules to analyze the audit log data … does not make them eligible").

Finally, as with the Correlation Patents, the asserted claims of the '380 patent do not involve any of the non-abstract or inventive concepts that have sufficed to uphold different types of data security claims.[14] Unlike in those cases, the asserted claims describe no improvement to computer technology; they instead recite the abstract idea of filtering data files based on file identifiers, which *Symantec* holds is unpatentable. The claims themselves recite no actual rules for identifying which data transfer protocols might indicate a possible exfiltration, and as noted such rules would in any event be purely abstract concepts. And the asserted claims do not even purport to identify **actual** exfiltrations; rather, they merely apply unstated rules to identify and

---

level of detail in the specification does not transform a claim reciting only an abstract concept into a patent-eligible system or method").

[14] *See*, *e.g.*, *Packet Intelligence*, 965 F.3d at 1309-10 (claim "solve[d] a technological problem" through an extractive "parser subsystem" and "flow insertion engine coupled to the memory" that created "a more granular, nuanced, and useful classification of network traffic"); *SRI*, 930 F.3d at 1303, 1304 (claims directed to an "'improvement in computer capabilities'—that is, providing a network defense system that monitors network traffic in real-time to automatically detect large-scale attacks" by "using network monitors and analyzing network packets"); *Finjan*, 879 F.3d at 1304-05 (claims generated and attached a new "security profile" to a downloadable file via innovative "behavior-based" virus scan that "include[d] 'details about the suspicious code in the received downloadable,'" including "all potentially hostile or suspicious code operations"); *BASCOM*, 827 F.3d at 1350 (claims improved computer technology with "a filter implementation versatile enough that it could be adapted to many different users' preferences while also installed remotely in a single location"); *cf. Glasswall*, 754 F. App'x at 999 ("Unlike in *Finjan*, the claims here do not filter based on behavior, but based on the allowable form of information within a file" and "do not create a new kind of file or improve the functioning of the computer itself") (emphasis omitted).

block all application packets whose data transfer protocols "indicate" that the applications *might* involve exfiltrations.  '380 patent at 13:36-14:2, 15:21-16:6.  There is nothing remotely innovative about that rudimentary process; it merely requires looking at a particular packet header field and dropping the packet if it uses a data transfer protocol that indicates an exfiltration method—even if no actual exfiltration has occurred—based on unknown rules nowhere stated in the claims.  *See*, *e.g.*, *Braemar Mfg., LLC v. ScottCare Corp.*, 816 F. App'x 465, 469-70 (Fed. Cir. 2020) (claims "directed to the abstract idea of collecting, classifying, and filtering data" using "conventional computer technology" … "do not contain an inventive concept").

In sum, just as with the Correlation Patents, the asserted claims of the '380 patent are directed to an abstract idea—filtering unwanted data files based on file identifiers—that involves no technical improvement to computer technology; and the claims recite no inventive concept beyond that abstract idea.  The claims are therefore ineligible under Section 101.

## IV.    CONCLUSION

For the foregoing reasons, the asserted claims of the Correlation Patents and the '380 patent are not patent eligible under 35 U.S.C. § 101.  PAN therefore respectfully requests that the Court grant its motion for judgment on the pleadings with respect to the 5th, 6th, 7th, 8th, 15th, 16th, 25th, and 26th causes of action in the Amended Complaint.

Dated: October 26, 2023

Respectfully submitted,

PALO ALTO NETWORKS, INC.
By Counsel

By: */s/ Robert W. McFarland*
Robert W. McFarland (VSB No. 24021)
**MCGUIREWOODS LLP**
101 W. Main Street, Suite 9000
Norfolk, Virginia 23510
Telephone: (757) 640-3716
Facsimile: (757) 640-3966
E-mail: rmcfarland@mcguirewoods.com

Jonathan P. Harmon (VSB No. 39081)
David E. Finkelson (VSB No. 44059)
**MCGUIREWOODS LLP**
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3916
Telephone: (804) 775-1000
Facsimile: (804) 775-1061
E-mail: jharmon@mcguirewoods.com
E-mail: dfinkelson@mcguirewoods.com

Brett C. Govett (Admitted *Pro Hac Vice*)
James S. Renard (Admitted *Pro Hac Vice*)
Jacqueline Baker (Admitted *Pro Hac Vice*)
**NORTON ROSE FULBRIGHT US LLP**
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201
Telephone: (214) 855-8000
brett.govett@nortonrosefulbright.com
james.renard@nortonrosefulbright.com
jackie.baker@nortonrosefulbright.com

Richard Zembek (Admitted *Pro Hac Vice*)
Daniel S. Leventhal (Admitted *Pro Hac Vice*)
Daniel A. Prati (Admitted *Pro Hac Vice*)
**NORTON ROSE FULBRIGHT US LLP**
1301 McKinney Street, Suite 5100
Houston, Texas 77010
Telephone: (713) 651-5151
richard.zembek@nortonrosefulbright.com
daniel.leventhal@nortonrosefulbright.com
daniel.prati@nortonrosefulbright.com

Stephanie DeBrow (Admitted *Pro Hac Vice*)
Talbot R. Hansum (Admitted *Pro Hac Vice*)
**NORTON ROSE FULBRIGHT US LLP**
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701
Telephone: (512) 474-5201
stephanie.debrow@nortonrosefulbright.com
talbot.hansum@nortonrosefulbright.com

James R. Batchelder (Admitted *Pro Hac Vice*)
Andrew T. Radsch (Admitted *Pro Hac Vice*)
**ROPES & GRAY LLP**
1900 University Avenue, 6th Floor

East Palo Alto, CA 94303
Telephone: (650) 617-4000
james.batchelder@ropesgray.com
andrew.radsch@ropesgray.com

Josef B. Schenker (Admitted *Pro Hac Vice*)
**ROPES & GRAY LLP**
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
josef.schenker@ropesgray.com

***COUNSEL FOR PALO ALTO NETWORKS, INC.***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 26, 2023, the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will automatically send notification of electronic filing to all counsel of record.

*/s/ Robert W. McFarland*
Robert W. McFarland (VSB No. 24021)
**MCGUIREWOODS LLP**
101 W. Main Street, Suite 9000
Norfolk, Virginia 23510
Telephone: (757) 640-3716
Facsimile: (757) 640-3966
E-mail: rmcfarland@mcguirewoods.com

***COUNSEL FOR PALO ALTO NETWORKS, INC.***